IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 4:CR-07-304 |
| | : | |
| v. | : | Judge James F. McClure, Jr. |
| | : | |
| PAUL SURINE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

July 24, 2009

**BACKGROUND:**

On September 27, 2007, a grand jury sitting in the Middle District of
Pennsylvania handed down a three-count superceding indictment against Paul
Surine, Shane Curry and Jimmy Dake, charging them with conspiracy to distribute
controlled substances (21 U.S.C. § 846) (Count One); distribution of a controlled
substance (21 U.S.C. § 841(a)(1)) (Count Two); and (as against Paul Surine only),
possession of a firearm during a drug trafficking crime (18 U.S.C.§ 924(c)(1))
(Count Three).

On May 30, 2008, Surine pled guilty to count one of the first superseding
indictment. On September 5, 2008, the court received the Presentence
Investigation Report ("PSR") which produced an advisory guideline range of 360
months to life. Surine objected to seven paragraphs in the PSR. His objections

1

can be summarized into three issues that could affect the guideline range: the base

offense level, e.g. the amount of cocaine base distributed; the specific offense

characteristics, e.g. whether or not the defendant possessed a dangerous weapon,

specifically, a firearm; and an aggravating role in the offense; e.g. whether or not

he was organizer or leader in the criminal activity.[1]  If all three issues are resolved

in Surine's favor, the guideline imprisonment range would decrease to 120 to 135

months.

Beginning on June 11, 2009 and resuming on June 22, 2009, an evidentiary

hearing was held for the parties to present evidence on these objections.  The

government filed a sentencing memorandum on July 7, 2009. (Rec. Doc. No. 276).

Surine filed a sentencing memorandum on July 15, 2009.  (Rec. Doc. No. 277).

The objections are ripe for disposition.

We will overrule defendant's objections to paragraphs 5, 6, 8, and 9, and

sustain his objections to paragraphs 10, 11, and 13 in so far as they are consistent

with this Memorandum. The resulting advisory sentencing guideline range is 324

---

[1]In his sentencing memorandum, Surine also makes an argument concerning
his addiction to crack cocaine.  His addiction argument is not related to the
objections in the presentence report and does not affect the guideline range; rather,
it is an argument for a variance and, therefore, will not be considered in this
Memorandum and Order.  The addiction argument will be considered at the
sentencing hearing as part of the § 3553 considerations.

to 405 months.

**FACTS:**

The facts, taken from the PSR, are as follows. From May 1, 2005 to February 1, 2007, Surine was the (alleged) leader of a conspiracy to distribute crack cocaine in Tioga County. Eight others were also charged in this case or related cases as allegedly part of the conspiracy. Lisa Lehman was Surine's girlfriend. Sonny Surine and Jimmy Dake are the defendant's sons. Shane Curry is Lisa Lehman's son. Others charged are Glenn Glover, Cheryl Gilbert, Donald Carr, and Paul Carr.

Paul Surine lived on a property in Tioga County consisting of several mobile homes, which investigators have described as a "complex." The complex was the hub of the conspiracy, where deliveries of cocaine hydrochloride and crack cocaine would arrive from suppliers from New York State. Cocaine and cocaine base would also be sold from the complex. Allegedly, at least an ounce of cocaine was delivered to the complex every other day throughout the duration of the conspiracy. Of this amount, approximately half was hydrochloride and half was crack. Allegedly, Surine would direct other members of the conspiracy to travel to New York state to pick up the drugs. At the complex, Surine would process cocaine hydrochloride into crack cocaine, and package and distribute the crack

cocaine.

Approximately 100 to 200 individuals would purchase cocaine from the Surine complex. Payment was made in either cash or property. Allegedly, Surine would also accept firearms as payment. Allegedly, Surine possessed with intent to deliver in excess of 4.5 kilograms of crack cocaine throughout the course of the conspiracy.

On May 30, 2008, Surine pled guilty to conspiring to possess with the intent to distribute fifty grams or more of cocaine base, from May 1, 2005, up to and including February 1, 2007.

**DISCUSSION:**

Nine individuals testified over the course of the two days of hearings. Paul Surine testified. Trooper Nick Madigan, the officer in charge of the investigation testified. Other defendants, although not co-defendants, who testified were Lisa Lehman (Surine's girlfriend at the time of the conspiracy), Cheryl Gilbert, and Glenn Glover. As part of their respective plea agreements, all three defendants agreed to cooperate with the government. Non-defendants who testified were Francis Surine (Paul Surine's son), Jessica Starkweather (Paul Surine's niece), Chance Decoursey, and Mary Kay Gregus. We find that the testimony of Paul Surine is not credible, but we do find credible the testimony of all the other

witnesses.

### 1.  Base Offense Level

Defendant objects to paragraphs 6, 10, 11, and 13 of the PSR.  Surine's
objection to paragraph 6 is that he did not cook powder cocaine into crack cocaine
for resale, but for personal use.  Surine's objection to paragraph 10 is that he did
not sell one kilogram of crack cocaine to Cheryl Gilbert, and also that he did not
receive ten ounces of crack cocaine from individuals called "J" and/or "G."
Surine's objection to paragraph 11 is that while he admits he received powder
cocaine from Glenn Glover, Cheryl Gilbert, and Shaggy Brockway, he denies
distributing this cocaine.  He states it was returned to the supplier because it was
impure.  Surine's objection to paragraph 13 is that he asserts the amount of cocaine
possessed by him with intent to deliver is no more than 150 grams.

The Base Offense Level is determined by Guideline § 2D1.1(3), as Surine
pled guilty to Conspiracy to Possess with the Intent to Distribute 50 Grams and
More of Cocaine Base pursuant to 21 U.S.C. § 846.  § 2D1.1(3) sets the offense
level as specified in the Drug Quantity Table set forth in subsection (c).   The
quantity set forth in the presentence report is 4.5 kilograms or more of cocaine
base, which results in a base offense level of 38.  Surine's objection to the
presentence report states that he is only responsible for 150 grams of cocaine base,

which would result in a base offense level of 32.  However, Surine's sentencing

memorandum cites the testimony of Surine, who testified that he sold between 500

and 1,000 grams of cocaine base, which, if true, would result in a base offense

level of 34.

*Testimony*

Lisa Lehman (who had previously been sentenced to 96 months for her part

in the conspiracy) testified that deliveries of crack cocaine and powder cocaine

from New York State to the Surine complex took place approximately every three

to four days in the beginning of the conspiracy, then it tapered off for a while

because they were robbed, and then it started picking up again just before they

were caught.  (Rec. Doc. No. 272 at 5).  Lehman testified that the deliveries cost

between $800 to $1,800 per week, possibly an ounce every other day.  (Id. at 5-6).

She testified that at the beginning half was powder cocaine, half was crack, but by

the end it was just crack that was brought.  (Id. at 7).  The powder cocaine would

be processed into crack cocaine, "most of the time" by Paul Surine.  (Id. at 6).

Lehman also testified that the conspiracy had about 50 to 100 customers,

customers who would come to the house 24 hours a day.  (Id. ay 8-9).  Paul Surine

would himself make some of the sales.  (Id. at 9).  Paul Surine mailed between five

and ten money orders to the dealers in New York State.  (Id.)  Once she saw Paul

Surine with a gallon-sized plastic bag approximately three-fourths full of powder cocaine that he processed into crack cocaine.  (<u>Id.</u> at 10).

Francis Surine testified that, in the six months he lived with his father, Paul Surine, powder cocaine was delivered to the complex approximately "a couple" times a week, each time being approximately "a couple" ounces.  (<u>Id.</u> at 23 and 25).  "A couple" of ounces meaning two or three.  (<u>Id.</u> at 30).  Later in his testimony, Francis Surine admitted that he had testified to the grand jury that suppliers came to the complex daily and would deliver an ounce or two each time.  (<u>Id.</u> at 37).  Either Lisa Lehman or Paul Surine would place the order with the New York suppliers.  (<u>Id.</u> at 27).  "Most" of the powder delivered was processed into crack by Paul Surine and Lisa Lehman.  (<u>Id.</u> at 25-26).  About 20 cars per day arrived to purchase crack.  (<u>Id.</u> at 25).  The average purchase would be a gram or a "dime."  (<u>Id.</u>)  The largest purchase he witnessed was 3 grams.  (<u>Id.</u>)

Jessica Starkweather testified that Paul Surine and Lisa Lehman supplied her with crack cocaine, at least once daily, at times more than once.  (<u>Id.</u> at 44).  She made about 200 purchases in six months.  (<u>Id.</u> at 46).   She testified that she usually purchased crack cocaine, and that she only purchased powder cocaine "a couple" of times.  (<u>Id.</u>)

Chance Decoursey testified that he typically purchased not quite half a gram

of crack cocaine about 50 times from Paul Surine's trailer. (Id. at 53).

Mary Kay Gregus testified that she purchased between a gram to several grams of crack cocaine, at times six to seven times a day, from either Paul Surine or Lisa Lehman. (Id. at 59-60). She also testified that she was present at times when powder cocaine was processed into crack cocaine at the residence. (Id. at 61). She estimated that she purchased an ounce a week over a six month time span. (Id. at 63). She also testified that only a small circle of people were allowed to deal directly with Paul Surine. (Id. at 67).

Cheryl Gilbert testified that over the course of one year, she went to Paul Surine's trailer every day to purchase crack cocaine, usually at least two grams daily. (Id. at 69). She estimated that she purchased at least 800 grams of crack cocaine in total over the course of the year. (Id. at 70). She further estimated that she bought $100,000 of crack from Paul Surine over the course of the year. (Id. at 79). She would purchase the crack cocaine from either Paul Surine or Lisa Lehman. (Id. at 71). Every day she would see cars with New York state license plates at the trailer. (Id.) These individuals were either there to purchase or to sell drugs. (Id. at 71). She would see one particular supplier from New York at the Surine trailer at least once a week over the year. (Id. at 75). When she would go to the trailer, there would be other cars as well, usually four or five in the driveway at

a time.  (<u>Id.</u> at 72).  She also testified that 80% of the time, it was Paul who would process the cocaine from powder into crack.  (<u>Id.</u> at 76).  She also admitted that part of her plea agreement is to cooperate with the United States.  (<u>Id.</u> at 82).

Glenn Glover testified that from early 2006 until February 1, 2007, he began to go to the Surine trailer to buy marijuana, then later he was able to buy crack.  (<u>Id.</u> at 90).  He would purchase from both Paul Surine and Lisa Lehman.  (<u>Id.</u> at 90).  He would go to the Surine trailer at least once a day, sometimes up to six or seven times a day.  (<u>Id.</u>)  He estimated that in that 13 month period he went to the Surine residence 800 times, and purchased about 700 or 800 grams.  (<u>Id.</u> at 91 and 97).  He did not purchase that 700 or 800 grams alone, that amounts includes amounts purchased together with his girlfriend, Cheryl Gilbert.  (<u>Id.</u> at 100).   He also estimated that he spent at least $100,000 or $200,000.  (<u>Id.</u>)  He testified that Paul Surine would process the powder cocaine into crack cocaine about 80% of the time, Lisa Lehman about 20%.  (<u>Id.</u> at 95).  He admitted that his plea agreement with the United States includes testifying against Paul Surine.  (<u>Id.</u> at 99).

Trooper Nick Madigan, of the Pennsylvania State Police, testified that the police had had information about the activity on Paul Surine's property for several years, but were not able to open an active investigation until the summer of 2006.  (Rec. Doc. No. 266 at 5).  He made undercover purchases of mostly crack cocaine,

but also methamphetamine, from Cheryl Gilbert.  (Id.)  Cheryl Gilbert took

Trooper Madigan to the Paul Surine residence the first time he purchased from her,

May 3, 2006).  (Id. at 6).  He purchased crack cocaine from the Paul Surine

residence three times, and an informant also made a purchase from the Surine

residence for Trooper Madigan.  (Id.)  Trooper Madigan was present for all four

purchases, which totaled between 5-10 grams of crack cocaine.  (Id.) All of the

drugs purchased on these four occasions field tested positive for crack cocaine, and

were subsequently analyzed by the State Police laboratories and proven to be crack

cocaine.  (Id. at 8).  The state police also did surveillance and drive-bys, and found

that there was always "a lot" of traffic at the property.  (Id.)

Paul Surine testified that he, Lisa Lehman, and Sonny Surine did not

distribute more than a kilo of crack cocaine.  (Id. at 31).  He further testified that

the suppliers from New York State would arrive at his trailer to deliver crack

cocaine about every day to every other day.  (Id. at 36).  He testified that the

suppliers would deal with him about 50% of the time, the other 50% with Lisa or

other people.  (Id. at 40).   He also testified that most of the time the cocaine

arrived already cooked, and that when it was not, either he or Lisa Lehman would

process it.  (Id. at 37).  He testified that most of the purchasers were buying crack

cocaine from Lisa Lehman, and that he only sold to four or five people.  (Id. at 42).

He is sure that he did not distribute 4.5 kilograms of crack cocaine from his trailer, because he is sure that he did not pay the New York State suppliers over $100,000. (Id. at 43). He estimated that he sold no more than 500 grams of crack cocaine. (Id. at 48).

*Amount delivered to the Surine trailer as calculated from the testimony*

Lisa Lehman testified that one ounce was delivered every other day over the course of the conspiracy, which was about 18 months, which equals 252 ounces in that time.[2] Of that 252 total ounces, she testified that, conservatively, half was powder cocaine, half was crack cocaine. 252 ounces is 7.14 kilograms. So, of the 7.14 kilograms of cocaine delivered, approximately 3.5 kilograms were crack cocaine and 3.5 kilograms were powder cocaine. Lehman also testified that "most of the time it was Paul Surine who would process the powder cocaine into crack cocaine. So of the 3.5 kilograms delivered from the New York State supplier, Paul Surine processed "most of it" into crack cocaine. Based on Lehman's testimony, the amount of crack cocaine that Paul Surine possessed with the intent to distribute was at least 3.5 kilograms, the figure being somewhere between 3.5 kilograms and 7.14 kilograms.

---

[2]All calculations are based on a 28 day month, in an effort to be conservative.

11

Francis Surine testified initially that for the six months he was at the trailer, two to three ounces were delivered to Paul Surine's trailer about two to three times per week. Later he admitted that in front of the grand jury, he had testified that daily one to two ounces were delivered. Based on his acknowledgment of his grand jury testimony, which would have been based on knowledge more fresh than his sentencing hearing testimony, his testimony calculates to between 168 and 336 ounces of powder cocaine delivered to the trailer in six months. Converting ounces to kilograms, between 4.7 kilograms and 9.5 kilograms of powder cocaine were delivered. Of this amount, "most" of the powder was processed into crack cocaine. Based on Francis Surine's testimony, the amount of crack cocaine that Paul Surine possessed with the intent to deliver would be, at a minimum, "most of" the 4.7 kilograms of powder cocaine that was delivered to the trailer in six months.

*Amount sold from the Surine trailer as calculated from the testimony*

Chance Decoursey testified that he typically purchased "not quite" half a gram of crack cocaine about 50 times from Paul Surine's trailer, which adds up to "not quite" 25 grams of crack cocaine purchased. Converting grams to kilograms, he purchased 0.025 kilograms of crack cocaine.

Mary Kay Gregus purchased an ounce a week over a six month time span, which comes out to approximately 168 ounces purchased. Converting ounces to

kilograms, she purchased, from either Paul Surine or Lisa Lehman, approximately 4.76 kilograms of crack cocaine.

Cheryl Gilbert testified that she purchased about 800 grams of crack cocaine from Paul Surine and Lisa Lehman. Glenn Glover, Gilbert's boyfriend at the time, testified that he and Gilbert together purchased, from either Paul Surine or Lisa Lehman, about 700-800 grams of crack cocaine. So between the two, converting grams to kilograms, they purchased approximately 0.7 to 0.8 kilograms of crack cocaine.

Trooper Madigan was present for purchases of 5-10 grams of crack cocaine, which converts to between 0.005 to 0.01 kilograms of crack cocaine.

Paul Surine testified that he sold no more than 500 grams of crack cocaine, which converts to 0.5 kilograms of crack cocaine.

*Total amount of crack cocaine possessed with intent to distribute by Paul Surine, and the applicable Guideline Base Offense Level*

The government is arguing that based on the testimony of the preceding individuals as to how much cocaine was delivered to the trailer in conjunction with the testimony regarding the number of customers and cars at the trailer at any given time, the volume of crack cocaine distributed is in excess of 4.5 kilograms. Surine argues, based on his testimony alone, that he is only responsible for between 500

and 1,000 grams of cocaine.  We find the amount to be somewhere in between.

Based on Lisa Lehman's testimony, the amount is somewhere between 3.5 kilograms and 7.14 kilograms.  Based on Francis Surine's testimony, the amount is "most of" 4.7 kilograms.  We find that the government has shown by a preponderance of the evidence that Paul Surine is responsible for, at most, 3.5 kilograms of cocaine.  As a result, we sustain Surine's objection to paragraph 13 of the PSR.  However, we find that the amount of cocaine base Paul Surine possessed with the intent to deliver was at least 1.5 kg but less than 4.5 kilograms of cocaine base.  As a result, the base offense level set forth in the PSR is reduced from 38 to 36, pursuant to Guideline § 2D1.1.

Surine's objection to paragraph 6 is overruled, as there is ample testimony that Surine cooked powder cocaine into crack cocaine for resale. Surine's objection to paragraph 10 is sustained, as the amount of cocaine Cheryl Gilbert testified was sold to her was less than one kilogram, and there was not sufficient testimony about the amount of crack cocaine received from "J" and or "G."   Surine's objection to paragraph 11 is sustained, as there is insufficient testimony regarding the powder cocaine allegedly received from Glenn Glover, Cheryl Gilbert, and Shaggy Brockway.

<u>2.  Specific Offense Characteristics</u>

Defendant objects to paragraphs 8 and 9 of the PSR, asserting he did not accept firearms as payment for cocaine.

If a dangerous weapon (including a firearm) was possessed, the offense level is increased by 2, pursuant to Guideline § 2D1.1(b)(1). A "firearm" is defined as "(I) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive . . ." According to application note 3, to § 2D1.1 "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

Lisa Lehman testified that firearms were swapped for crack. (Rec. Doc. No. 272 at 7 and 17). She estimated that guns were traded by Paul Surine to the New York suppliers 5 to 10 times. (Id. at 8). She also testified that Paul Surine kept firearms, handguns and shotguns, for protection. (Id.) She further testified that once, Paul Surine pointed a firearm at one of the individuals from New York State who was delivering the crack cocaine. (Id. at 11).

Francis Surine testified that firearms were swapped to the New York State suppliers. (Id. at 27-28 and 38). He further testified that Paul Surine would fire the gun out the window to scare people off. (Id. at 29).

Chance Decoursey testified that he traded firearms for crack cocaine five

times with Paul Surine.  (Id. at 54).

Cheryl Gilbert testified that she witnessed customers trade firearms to Paul Surine at least two or three times.  (Id. at 78).  She also testified that she witnessed Paul Surine swap firearms to his suppliers from New York State two or three times.  (Id.)

Glenn Glover testified that he witnessed people exchange firearms with Paul Surine for crack.  (Id. at 92).  He also testified that he once exchanged a firearm, a .22, with Paul Surine for crack.  (Id. at 92-93).  Paul Surine asked him to take a trip to New York State to pay for cocaine that had already been delivered, and to pick up more cocaine.  (Id. at 95).  One of the items Glover had taken, at the direction of Paul Surine, was a .38 caliber pistol.  (Id.)  He also testified that Paul Carr once traded firearms, four rifles, with Paul Surine for crack.  (Id.)

Paul Surine testified that a few of the firearms that were mentioned in previous testimony were not complete guns, and that most of them were antiques. (Rec. Doc. No. 266 at 29).

The government has met their burden of proving that a dangerous weapon was possessed.  Surine's objections to paragraphs 8 and 9 of the PSR are overruled, as evidenced by the testimony that Paul Surine swapped firearms for crack cocaine.  The two-level enhancement in the PSR pursuant to 2D1.1 remains.

### 3. Adjustment for Role in the Offense

Defendant objects to paragraphs 5 and 9 of the PSR. Surine objects to paragraph 5, asserting that he was not the leader of the conspiracy, but a member of the conspiracy. Surine objects to paragraph 9, because he asserts he did not direct members of the conspiracy to travel to New York to pick up drugs, or any other overt act.

Based on the defendant's role in the offense, the offense level is increased by 4 levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," pursuant to Guideline § 3B1.1(a). According to application note 3 to Guideline § 3B1.1,

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

Lisa Lehman testified that Paul Surine made the arrangements for the crack cocaine to be picked up in New York State and for the crack cocaine to be delivered to the residence in Tioga County. (Rec. Doc. No. 272 at 5). She also

17

testified that when items were swapped for crack cocaine, Paul Surine would approve the swap.  (Id.)

Francis Surine testified that Lisa Lehman could take swaps for crack cocaine herself, without direction from anyone.  (Id. at 32).  He further testified that Paul Surine never asked him to sell crack cocaine.  (Id. at 33).  He testified that in his opinion, Paul Surine and Lisa Lehman both had equal responsibility.  (Id. at 34).  He further testified that Paul Surine sent Glenn Glover and some other people to New York State to pick up crack cocaine.  (Id. at 38).  He also testified that Paul Surine sent people to New York State a couple of times a week to purchase the powder or crack cocaine.  (Id.)

Jessica Starkweather testified that Paul Surine and Lisa Lehman had 'gophers' acting as middle men, so that they would not have to hand the crack cocaine to people.  (Id. at 47).  She can not remember clearly, because of the control the drugs had on her mind, but she thinks that when she would trade an item for crack cocaine, both Paul Surine and Lisa Lehman had to agree to the trade.  (Id. at 48).

Chance DeCoursey testified that his purchases, whether done with money or firearms, were from Paul Surine.  (Id. at 53).

Mary Kay Gregus testified that Paul Surine was very specific about ensuring

the deal was correct, i.e. the bags were weighed out correctly. (<u>Id.</u> at 61). When she traded jewelry for crack cocaine, the trade was with Paul Surine. (<u>Id.</u> at 64). She testified that initially Paul Surine tried to insulate himself from the deals, but eventually she would purchase equally from either Paul Surine or Lisa Lehman. (<u>Id.</u> at 65 and 67). There was only a small circle who were allowed to deal directly with Paul Surine. (<u>Id.</u> at 67). Although at one point in time she was selling the drugs to others, that was to supply her own habit; Paul Surine did not ask her to distribute drugs. (<u>Id.</u>)

Cheryl Gilbert testified that she was selling crack cocaine to other individuals. (<u>Id.</u> at 70). She would deal with Paul Surine and Lisa Lehman equally. (<u>Id.</u> at 71). She, Glenn Glover, and Shag Rockway made a trip to New York State at the direction of Paul Surine because Rockway owed Paul Surine and Lisa Lehman money, so Cheryl Gilbert and Glenn Glover drove Rockway to New York State to cash a check. (<u>Id.</u> at 74). While in New York State, they met with Paul Surine's supplier and brought back powder cocaine. (<u>Id.</u> at 75). She also testified that Paul Surine would process the cocaine from powder to crack 80% of the time, Lisa Lehman 20%. (<u>Id.</u> at 76). She was present when Paul Surine would swap guns or other items to the dealers from New York state. (<u>Id.</u> at 78).

Glenn Glover testified that Paul Surine was the one to approve whether an

item was going to be accepted as payment for crack cocaine. (Id. at 92). He also testified that Paul Surine would process the powder cocaine into crack cocaine 80% of the time, Lisa Lehman, 20%. (Id. at 95). Paul Surine asked him to take a trip to New York State to pay for cocaine that had previously been delivered and to pick up more cocaine. (Id.)

Trooper Madigan testified that Donald and Paul Carr were not under the direction of Paul Surine; they were operating on their own. (Rec. Doc. No. 266 at 15). He also testified that Cheryl Gilbert and Glenn Glover were "by and large" not under the direction of Paul Surine, meaning that any proceeds they would gain were their own to keep. (Id. at 15-16). Trooper Madigan testified that Cheryl Gilbert, Glenn Glover, Paul Carr, Donald Carr, Francis Surine, Lisa Lehman, Sonny Surine, and Shane Curry were all obtaining their supply of cocaine from Paul Surine to redistribute to others. (Id. at 20).

Paul Surine testified that things were Lisa's "way or no way." (Id. at 27). He also testified that he and Lisa Lehman made joint decisions with respect to selling or trading goods. (Id. at 29). Paul Surine further denied sending Glen Glover to New York State to deliver a parcel and bring back crack cocaine. (Id. at 43).

Surine's objections to paragraph's 5 and 9 of the PSR are both overruled.

The government has met its burden of proving that Paul Surine was an "organizer or leader of a criminal activity that involved five or more participants," thus supporting the four level enhancement based on his role in the offense. In coming to this conclusion, we examined the factors set forth in application note 4 to Guideline § 3B1.1. Several individuals testified who had decision-making authority. Paul Surine had the authority to approve trades of items for crack cocaine, as opposed to money. Also, the nature of his participation in the offense was such that he would send "gophers," including his son, Sonny Surine, to sell drugs for him to insulate himself from being seen. Additionally, only a small circle of individuals, of the hundreds of customers buying drugs from the Surine complex, were allowed to deal directly with Paul Surine. Paul Surine's recruitment of accomplices included his own sons, Francis Surine and Sonny Surine, along with Lisa Lehman, Cheryl Gilbert, Glen Glover, Francis Dake, Shane Curry, Donald Carr and Paul Carr. While both Carrs, Cheryl Gilbert and Glenn Glover were allowed to keep the profits they made from selling cocaine for themselves, they nevertheless were procuring the crack cocaine for resale from Paul Surine; thus the criminal activity included at least nine participants, in addition to Paul Surine himself. Finally, with respect to the degree of control and authority exercised over others, Cheryl Gilbert and Glenn Glover both testified that they

took a trip to New York State to pay off a debt and make a purchase for Paul Surine at the direction of Paul Surine, even though he claims otherwise.

As a result of all of the foregoing testimony, the four level enhancement for Paul Surine's role in the offense stands as currently set forth in the PSR.

**CONCLUSION**

Defendant's objections to paragraphs 5, 6, 8, and 9 of the PSR are overruled. Defendant's objections to paragraphs 10 and 11 of the PSR are sustained. Defendant's objection to paragraph 13 of the PSR is sustained. However, we find the defendant responsible for at least 1.5 kg but less than 4.5 kg of cocaine base; therefore, the base offense level is 36 in accordance with Guideline § 2D1.1.

The Base Offense Level is 36, a two-level enhancement is applied for Surine's possession of firearms, a four-level enhancement is applied for Paul Surine's role in the offense, and the three-level reduction in paragraph 24 of the PSR stands as it is in the PSR. Thus, the total offense level is 39. As Paul Surine's criminal history computation also stands unchanged in the PSR at a Criminal History Category of III, the Guideline Range is now 324 months to 405 months imprisonment.

<u>s/James F. McClure, Jr.</u>
James F. McClure, Jr.
United States District Judge

22

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 4:CR-07-304 |
| | : | |
| v. | : | Judge James F. McClure, Jr. |
| | : | |
| PAUL SURINE, | : | |
| | : | |
| Defendant. | : | |

**ORDER**
July 24, 2009

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's objections to paragraphs 5, 6, 8 and 9 of the Presentence Investigation Report are OVERRULED.

2. Defendant's objections to paragraphs 10, 11 and 13 of the Presentence Investigation Report are SUSTAINED, in so far as they are consistent with the accompanying Memorandum.

3. The advisory guideline range is 324 to 405 months imprisonment.

4. The defendant's sentencing is set for August 5, 2009 at 1:30 p.m. in Courtroom No. 3, Third Floor, Federal Building, 240 West Third Street, Williamsport, PA.

s/James F.  McClure, Jr.
James F. McClure, Jr.
United States District Judge