# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:07-CR-00304-1 |
| v. | (Judge Brann) |
| PAUL SURINE, | |
| Defendant. | |

## MEMORANDUM OPINION

### DECEMBER 9, 2019

Currently pending before the Court is Paul Surine's request for resentencing[1] pursuant to the First Step Act.[2] Surine asserts that this Court should impose a below-Guidelines sentence based primarily upon his good behavior while incarcerated.[3] The Government opposes any sentence reduction.[4] For the following reasons, the Court will deny Surine's request.

## I. BACKGROUND

In 2007, Surine was charged in a superseding indictment with one count of conspiracy to distribute 50 grams or more of cocaine base (Count 1), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), one count of distribution of cocaine base (Count 2), in violation of 21 U.S.C. § 841(a)(1), and one count of possessing a

---

[1] Docs. 403, 417.
[2] Pub. L. No. 115-391, 132 Stat. 5194 (2018).
[3] Doc. 417.
[4] Doc. 415.

1

firearm in furtherance of drug trafficking (Count 3), in violation of 18 U.S.C. § 924(c)(1).[5] In May 2008, Surine pled guilty, pursuant to a written plea agreement, to Count 1 of the superseding indictment, while the Government agreed to dismiss the remaining counts.[6]

The guilty plea was accepted and a Presentence Report (PSR) was prepared. The PSR noted that for nearly two years Surine was the leader of a conspiracy to distribute cocaine base in Tioga County, Pennsylvania.[7] Surine frequently directed his subordinates to travel to New York State to purchase cocaine for the conspiracy and sometimes personally oversaw the purchases.[8] Surine and other members of the conspiracy would convert the cocaine into cocaine base and sell it their customers, who numbered between 100 and 200 individuals.[9] Surine accepted property—including firearms—in exchange for the cocaine base.[10]

The PSR determined that the conspiracy involved more than 4.5 kilograms of cocaine base and, using the 2007 version of the U.S. Sentencing Guidelines Manual, calculated a base offense level of 38.[11] The offense level was increased by two levels because Surine possessed a firearm in connection with the offense, and by four levels

---

[5] Doc. 34.
[6] Docs. 142, 148.
[7] PSR at 1.
[8] *Id.* at 1-2.
[9] *Id.*
[10] *Id.* at 2.
[11] *Id.* at 3; USSG § 2D1.1(c)(1).

2

because Surine was the leader of a conspiracy that involved more than five individuals.[12] The offense level was reduced by three levels for acceptance of responsibility,[13] resulting in a total offense level of 41.[14] The PSR calculated a criminal history category III, resulting in a Sentencing Guidelines range of 360 months to life imprisonment.[15]

Surine objected to several portions of the PSR, which the late Honorable James F. McClure, Jr.,[16] of this Court, sustained in part after conducting a two-day hearing.[17] After hearing testimony from several witnesses, Judge McClure determined that Surine's testimony was not credible, but that the testimony of the other witnesses was credible.[18] Based upon the credible testimony, Judge McClure concluded that Surine was responsible for between 1.5 and 4.5 kilograms of cocaine base, and therefore calculated a base offense level of 36.[19] Judge McClure also determined that Surine possessed a firearm in connection with the offense and was the leader of a conspiracy that involved five or more people, and therefore overruled the remaining objections.[20] Accordingly, Judge McClure calculated a criminal

---

[12] PSR at 3-4; USSG §§ 2D1.1(b)(1), 3B1.1(a).
[13] USSG § 3E1.1.
[14] PSR at 4.
[15] *Id.* at 4-9, 13.
[16] Judge McClure died in 2010, and this matter was reassigned to the undersigned in 2013.
[17] Doc. 278; *see* Docs. 266, 272.
[18] Doc. 278 at 4-5.
[19] *Id.* at 5-14.
[20] *Id.* at 15-22.

history category III and an offense level 39, resulting in a Sentencing Guidelines range of 324 to 405 months' imprisonment.[21]

At the sentencing hearing, Judge McClure noted that the offense was quite serious: Surine had led a 21-month narcotics conspiracy that involved the sale of cocaine base to as many as 200 different individuals, as well as "extensive trading of firearms" with narcotics dealers in New York State.[22] Judge McClure stated that the offense was "particularly heinous" as Surine brought his own children into the conspiracy who eventually became addicted to cocaine base.[23] Judge McClure further observed that "[t]he use of cocaine [sold by Surine] by all of those people has meant that lives have either been destroyed or partially destroyed or in an irrevocable way impaired hugely."[24]

As to Surine's history and characteristics, Judge McClure concluded that "there isn't much that can be said good on your behalf, Mr. Surine. In fact, I kept looking at the presentence report for something that would be favorable to you, and really didn't find anything."[25] Despite having a criminal history category III, Surine had nine prior convictions that were not scored and displayed a continuous "disregard of the law" that dated back nearly three decades and included several

---

[21] *Id.* at 22.
[22] Doc. 304 at 9-10.
[23] *Id.* at 10.
[24] *Id.*
[25] *Id.* at 11.

4

serious offenses, such as a three-year period of sexual contact with his own daughter.[26] This history was offset to some degree, in Judge McClure's view, by Surine's demonstrated remorse.[27]

In addition to the seriousness of the offense and Surine's history, Judge McClure concluded that a within-Guidelines sentence was appropriate to reflect the seriousness of the offense, promote respect for the law, provide just punishment, protect the public, and deter others from engaging in such conduct.[28] Accordingly, Judge McClure sentenced Surine to 360 months' imprisonment.[29]

On appeal, the United States Court of Appeals for the Third Circuit affirmed Surine's conviction and sentence.[30] In 2015, this Court granted Surine's motion for a sentence reduction pursuant to Amendment 782 to the Sentencing Guidelines—which reduced Surine's Sentencing Guidelines range to 262 to 327 months' imprisonment—and reduced Surine's sentence to 291 months' imprisonment.[31] In 2018, Surine filed a 28 U.S.C. § 2255 motion, which this Court denied as time-barred.[32] In May 2019, Surine filed a motion for a resentencing hearing pursuant to the First Step Act; the Court denied that motion after determining that resentencing

---

[26] *Id.* at 11-12. *See* PSR at 4-9.
[27] Doc. 304 at 7, 12.
[28] *Id.* at 12.
[29] *Id.* at 12-13.
[30] Docs. 316, 317.
[31] Doc. 390.
[32] Docs. 392, 399, 400.

could be completed on the papers alone.³³ In accordance with the Court's directive, the parties have submitted sentencing memoranda, and the matter is now ripe for disposition.³⁴

## II. DISCUSSION

Section 404 of the First Step Act authorizes courts to resentence defendants if they were sentenced for a "covered offense" prior to August 3, 2010, the date that the Fair Sentencing Act of 2010 was enacted.³⁵ It is undisputed that Surine qualifies for resentencing under the First Step Act.³⁶ It is also undisputed that the Fair Sentencing Act of 2010 did not impact Surine's Sentencing Guidelines range, but reduced the mandatory minimum sentence for Surine's crime of conviction from 10 to 5 years' imprisonment, the maximum sentence from life to 40 years' imprisonment, and the minimum term of supervised release from 5 to 4 years.³⁷

In conducting resentencing, the Court must calculate the advisory Sentencing Guidelines range which, as just noted, remains unchanged at 262 to 327 months' imprisonment.³⁸ Next, the Court must "consider[] the parties' arguments and the [relevant 18 U.S.C. §] 3553(a) factors" to determine the appropriate sentence.³⁹

---

³³ Docs. 403, 404, 411.
³⁴ Docs. 415, 417.
³⁵ 132 Stat. 5194, 5222.
³⁶ Doc. 403 at 1-3, 7; Doc. 408 at 4-6.
³⁷ *Id.*
³⁸ *See United States v. Azcona-Polanco*, 865 F.3d 148, 151 (3d Cir. 2017) (noting that courts must first "calculate[] the applicable Guideline range").
³⁹ *Id.*

Those sentencing factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" as well as "to afford adequate deterrence . . . protect the public from further crimes of the defendant . . . and" provide the most effective medical care, correctional treatment, or educational and vocational training; (3) "the kinds of sentences available;" (4) "the kinds of sentence and the sentencing range" established for the offense; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among" similarly-situated defendants; and (7) "the need to provide restitution to any victims of the offense."[40]

Surine asserts that his post-sentencing rehabilitation changes the impact of all relevant sentencing factors.[41] Although Surine acknowledges the offense was serious, and that he has a lengthy criminal history, he argues that this is less relevant than his post-conviction actions that demonstrate "a change of character and a hopeful future."[42] Similarly, Surine contends that his conduct while incarcerated has satisfied any need for education and vocational training, and his age and rehabilitative efforts demonstrate a vastly reduced need to protect the public and

---

[40] 18 U.S.C. § 3553(a).
[41] Doc. 417.
[42] *Id.* at 4; *see id.* at 3-4.

7

provide deterrence.[43] Surine asserts that a reduced sentence would ameliorate sentencing disparities, and believes that the Sentencing Guidelines range is not a significant factor in resentencing.[44]

Many of the relevant sentencing factors considered by Judge McClure remain entirely unchanged and, in the Court's view, militate in favor of an unchanged sentence. First, the offense was a particularly serious one. The evidence demonstrates that Surine was the leader of conspiracy that involved the distribution—over the course of nearly two years—of between 2.8 and 3.5 kilograms[45] of cocaine base to as many as 200 different individuals in the central Pennsylvania region.[46] Surine personally directed numerous individuals to travel to New York State three to four days per week to obtain cocaine and cocaine base and transport it back to central Pennsylvania.[47] Surine set the prices, converted cocaine into cocaine base, and approved most trades of goods for cocaine base.[48] The seriousness of the offense is amplified by Surine's decision to get his own children addicted to cocaine base and then involve them in his criminal enterprise.[49] Surine's actions thus directly resulted in his own children's addictions and incarceration.

---

[43] *Id.* at 5-7.
[44] *Id.* at 8-9.
[45] *See* Doc. 278 at 14 (concluding that Surine trafficking, at most, 3.5 kilograms of cocaine base); Doc. 358 at 5-6 (determining that Surine trafficked at least 2.8 kilograms of cocaine base).
[46] Doc. 272 at 98-99.
[47] *Id.* at 5-8, 25-27, 38, 74-77, 95-96.
[48] *Id.* at 5, 7, 54, 60-62, 70-71, 90-92.
[49] *Id.* at 24, 28-29, 34.

Furthermore, during the course of the conspiracy, Surine exchanged firearms for narcotics on multiple occasions, and more than once traded firearms to drug dealers in New York State.[50] The Third Circuit has long recognized that firearms are tools of the trade for illegal drug activity, and that "receiving stolen weapons [is] closely related to violent crime."[51] Congress too has noted a direct correlation between violent crime and drug dealers possessing firearms; criminal statutes have thus been passed in "an effort to combat the dangerous combination of drugs and guns."[52] Given the intimate connection between violent crimes and possessing firearms while trafficking drugs, Surine's decision to place firearms in the hands of drug traffickers significantly increased the risk of deadly violence and placed countless individuals in jeopardy. Moreover, Surine kept firearms for protection, sometimes pointed firearms at people, and discharged firearms from his home when he was upset with other individuals.[53] Police seized between 22 to 26 firearms from Surine's residence when he was arrested.[54] This behavior was incredibly dangerous and demonstrates a significant risk to the public.

Second, Surine's history and characteristics prior to his sentencing have few redeeming aspects. The PSR details a consistent, lengthy, and uninterrupted

---

[50] *Id.* at 8, 27-28, 54, 78-79, 92-93, 97-98.
[51] *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011), *overruled on other grounds by Binderup v. Attorney Gen. U.S. of Am.*, 836 F.3d 336 (3d Cir. 2016).
[52] *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (discussing 18 U.S.C. § 924(c)(1)).
[53] Doc. 272 at 8, 11-12, 27, 29-30, 34, 63, 73-74, 94.
[54] Doc. 266 at 10.

criminal history that spans from the age of eighteen until the date of Surine's arrest in this matter. The PSR noted eleven separate criminal convictions,[55] meaning that Surine was convicted of a crime approximately once every two and one-half years. These convictions included serious offenses such as burglary and indecent assault, as well as several convictions for the highly dangerous offense of driving while intoxicated.[56] As Judge McClure noted, the offense of indecent assault was, to put it mildly, heinous; over the course of three years Surine engaged in a number of inappropriate sexual contacts with his own minor daughter, including at least three instances where Surine digitally penetrated his daughter.[57]

Third, given the nature of the offense, there is a need for a strong sentence to reflect the seriousness of the offense and provide just punishment. Moreover, in light of the offense and Surine's life-long disregard of the law, there is a need for the sentence to promote respect for the law. Similarly, despite Surine's apparent remorse for his crimes, given his lengthy and serious criminal history, as well as his history of maintaining, using, and discharging firearms in the presence of others when upset, the Court views Surine as being at a high risk of recidivism, and finds that there is a significant need for the sentence to afford adequate deterrence and to

---

[55] PSR at 4-9.
[56] *Id.* Although considered by some to be a less serious offense, it is clear that drunk driving is an incredibly dangerous activity. *See, e.g., Commonwealth v. O'Hanlon*, 653 A.2d 616, 618 (Pa. 1995) (Papadakos, J., dissenting) ("Drunk drivers are brainless lethal weapons").
[57] PSR at 8.

10

protect the public from further crimes of Surine. Although Surine asserts that his advanced age means that he is less likely to recidivate,[58] given his history, the Court is not convinced of that. Moreover, the fact of Surine's age is unchanged from his original sentencing; Judge McClure undoubtedly understood and accounted for Surine's age during sentencing, and this Court *did* consider Surine's age at the time of his eventual release when it resentenced him in 2015. Finally, while a term of supervised release will help protect the public,[59] supervised release alone is insufficient protection.

Contrary to Surine's assertion, the Court concludes that a sentence reduction is not needed to avoid unwarranted sentencing disparities. Although Surine accurately notes that his coconspirators have all completed their sentences,[60] Surine is not similarly situated to those coconspirators. As discussed previously, Surine was the leader of the conspiracy and engaged in conduct during the course of the conspiracy—such as approving the trade of firearms to other drug dealers and discharging firearms—that increased his culpability relative to any coconspirators. Moreover, many of the other coconspirators cooperated with authorities, which led to reduced sentences. Thus, the within-Guidelines-sentence that Surine is serving does not result in an *unwarranted* sentencing disparity. Additionally, the Third

---

[58] Doc. 417 at 6.
[59] *Id.* at 7.
[60] *Id.* at 7-8.

Circuit has repeatedly emphasized that "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case" and, thus, a defendant "cannot rely upon § 3553(a)(6) to seek a reduced sentence based on alleged disparity between his sentence and those imposed on his co-defendants."[61]

Weighed against these concerns is evidence related to Surine's postsentencing rehabilitative efforts. The United States Supreme Court has held that courts "may consider evidence of a defendant's postsentencing rehabilitation at resentencing."[62] Surine points to his activities while incarcerated and argues that those activities warrant a reduced sentence. Surine notes that he sought drug treatment while incarcerated, assisted other inmates, and established a work history in positions of responsibility.[63] Surine has obtained a GED and completed several educational and religious courses.[64] During Surine's incarceration, he has never been disciplined or written up for misbehavior.[65]

Although Surine's efforts and actions while incarcerated are commendable, he still has much to accomplish in the way of rehabilitation. Given the weight of evidence indicating that Surine poses a danger to society and a high risk of

---

[61] *United States v. Douglas*, 885 F.3d 145, 153 n.6 (3d Cir. 2018) (internal quotation marks omitted).
[62] *Pepper v. United States*, 562 U.S. 476, 504 (2011).
[63] Doc. 417 at 3-6.
[64] *Id.* at 5.
[65] *Id.* at 2; Doc. 471-1 at 4.

recidivism—particularly Surine's history of consistent and dangerous criminal behavior—the Court cannot conclude that his conduct while incarcerated has reduced those risks. Given the dangers that Surine presents, the Court will not exercise its discretion to reduce his sentence.[66]

## III. CONCLUSION

For the foregoing reasons, Surine's request for a sentence reduction pursuant to the First Step Act will be denied. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[66] Every circuit court that has considered resentencing decisions based upon postsentencing rehabilitative efforts has concluded that courts are not required to reduce a sentence, particularly when other factors weigh against such a reduction. *See United States v. Duke*, 932 F.3d 1056, 1063 (8th Cir. 2019) (holding "a district court is not *required* to reduce a defendant's sentence based on a showing of postsentencing rehabilitation; it is simply another factor for the court to consider under § 3553(a)" and "[g]iven the magnitude of Duke's offense conduct, it was reasonable under our deferential review for the court to conclude that his rehabilitative efforts did not warrant a sentence below the top of the guideline range"); *United States v. Roy*, 730 F. App'x 65, 67 (2d Cir. 2018) (noting "[a] district court may but is not required to impose a lesser sentence based on post-sentence rehabilitation efforts" and holding that "[t]he district court acted well within its discretion in not further lowering Roy's sentence in light of his criminal history . . . and the seriousness of the defendant's conduct"); *United States v. Blagojevich*, 854 F.3d 918, 920 (7th Cir. 2017) ("The authority recognized by *Pepper* belongs to the district judge. As with many discretionary subjects the fact that a judge *could* have ruled otherwise does not imply that the judge was *compelled* to rule otherwise"); *United States v. Santos*, 476 F. App'x 694, 696 (11th Cir. 2012) ("*Pepper* merely permits, and does not require, the district court to grant a downward variance if a defendant provides evidence of rehabilitation").